**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
:
**UNITED STATES OF AMERICA**
:
:
- against -
:
:      **09 Cr. 00722 (MGC)**
**PAUL GREENWOOD,**
:
:
**Defendant.**
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**SENTENCING MEMORANDUM**
**OF DEFENDANT PAUL GREENWOOD**

Frederick P. Hafetz
Nabilah T. Siddiquee
HAFETZ & NECHELES LLP
One Grand Central Place
60 E. 42nd Street
36th Floor
New York, NY 10165

*Attorneys for Defendant*
*Paul Greenwood*

# TABLE OF CONTENTS

Preliminary Statement………………………………………………………..  1

I.  The Offense Conduct and Mr. Greenwood's Acceptance of Responsibility...  3

II.  ████████████████████████████████████████.……………  5

III.  Mr. Greenwood's Cooperation with the Receiver in its Effort to Maximize
Victims' Recovery…………………………..……………………………  7

IV.  Mr. Greenwood's Personal Background and Character……………………...  10

V.  Objections to the Presentence Report…………………………………......  38

VI.  Application of the Advisory Sentencing Guidelines………………………  39

    A.  Calculation of the Advisory Guidelines……….……………………  39

    B.  The Fraud Guideline Over-emphasizes Loss Amount and Frequently
    Produces Inflated Advisory Sentences that Fail to Give Appropriate
    Consideration to Other 3553(a) Factors..……………………………  41

VII.  Consideration of the Section 3553(a) Factors Warrants a Sentence Far
Below the Guidelines Sentence……………………………………………  44

    A.  ███████████████████████████████
    ████████████████████████████e…...…………  46

    B.  Mr. Greenwood's Cooperation with the Receiver to Maximize
    Victims' Recovery is Grounds for a Substantially Below-Guidelines
    Sentence…………………………………………………...........  48

    C.  Mr. Greenwood's Role in the Offense………..……………………...  51

    D.  The Nature and Circumstances of this Offense Distinguish this Case
    from Others with Similar Offense Levels and Warrant a Sentence
    Far Below the Guidelines Sentence……………………....................  52

    E.  Mr. Greenwood's History and Characteristics Warrant a
    Substantially Below-Guidelines Sentence…………………………...  56

    F.  Other Sentencing Factors……………..…………………………...  59

Conclusion………………………………………………………………....  59

ii

# TABLE OF AUTHORITIES

**Cases**

*Cunningham v. Brown*,
  265 U.S. 1 (1924)..................................................................................................... 54
*Gall v. United States*,
  128 S. Ct. 586 (2007)............................................................................................... 45
*In re Bernard L. Madoff Inv. Sec. LLC*,
  458 B.R. 87 (Bankr. S.D.N.Y. 2011)....................................................................... 54
*Kimbrough v. United States*,
  552 U.S. 85 (2007)................................................................................................... 43
*Pepper v. United States*,
  131 S. Ct. 1229 (2011)....................................................................................... 45, 56
*Sentencing High–Loss Corporate Insider Frauds after Booker*,
  20 Fed. Sent. Rep. 167 (2008) ................................................................................. 42
*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006)......................................................... 41, 44, 59
*United States v. Boscarino*,
  437 F.3d 634 (7th Cir. 2006) ................................................................................... 47
*United States v. Byors*,
  586 F.3d 222 (2d Cir. 2009)..................................................................................... 40
*United States v. Canova*,
  412 F.3d 331 (2d Cir. 2005)..................................................................................... 59
*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008)..................................................................................... 42
*United States v. Corsey*,
  723 F.3d 366 (2d Cir. 2013)............................................................................... 43, 56
*United States v. Douglas*,
  713 F.3d 694 (2d Cir. 2013)..................................................................................... 46
*United States v. Emmenegger*,
  329 F. Supp. 2d 416 (S.D.N.Y. 2004)...................................................................... 42
*United States v. Hampton*,
  No. 13-cr-0301, 2013 WL 5366378 (S.D.N.Y. Sept. 25, 2013) ............................. 55
*United States v. Hsu*,
  669 F.3d 112 (2d Cir. 2012).............................................................................. 39, 40
*United States v. Kim*,
  364 F.3d 1235 (11th Cir. 2004) ......................................................................... 49, 53
*United States v. Mohammad*,
  315 F. Supp. 2d 354 (S.D.N.Y. 2003)...................................................................... 43
*United States v. Monsanto*,
  924 F.2d 1186 (2d Cir. 1991)......................................................................... 6, 8, 10
*United States v. Oligmueller*,
  198 F.3d 669 (8th Cir. 1999) ................................................................................... 49

*United States v. Ovid*,
   No. 09-cr-216, 2010 WL 3940724 (E.D.N.Y. Oct. 1, 2010) .................................................. 55
*United States v. Parris*,
   573 F. Supp. 2d 744 (E.D.N.Y. 2008) ............................................................................... 43, 44
*United States v. Rigas*,
   583 F.3d 108 (2d Cir. 2009).................................................................................................. 56
*United States v. Roen*,
   279 F. Supp. 2d 986 .............................................................................................................. 49
*United States v. Vilar*,
   729 F.3d 62 (2d Cir. 2013).................................................................................................... 40
*United States v. Woltmann*,
   610 F.3d 37 (2d Cir. 2010)................................................................................................... 45
*Warfield v. Byron*,
   436 F.3d 551 (5th Cir. 2006) ............................................................................................... 55

**Statutes**

18 U.S.C.A. § 3553(a) ..................................................................................................... passim

**Rules**

§ 2B1.1...................................................................................................................... 39, 42
§ 2S1.1 ............................................................................................................................ 39
U.S.S.G. § 5K1.1 ............................................................................................................ 47

**Other Authorities**

*United States v. Suarez-Reyes*,
   No. 12 CR 0067, 2012 WL 6597814 (D. Neb. Dec. 18, 2012) ............................................. 49
*United States v. Torres Teyer*,
   No. 01 CR. 21, 2006 WL 3511885 (S.D.N.Y. Dec. 6, 2006) ................................................ 47

## PRELIMINARY STATEMENT

We respectfully submit this memorandum on behalf of our client, Paul R. Greenwood, who is scheduled to be sentenced on December 3, 2014.  Mr. Greenwood pleaded guilty to the six-count Indictment pursuant to a plea agreement on July 28, 2010.  Mr. Greenwood understands the gravity of the crimes to which he has pleaded guilty, and he accepts responsibility for the harm caused by his crimes.  T█████████████████████████████ ███████████████████████████████████████████████e has attempted to demonstrate his genuine remorse and to make amends, to the extent possible, for the offenses that he committed.  ████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████  In addition, beginning almost immediately after his arrest, Mr. Greenwood has assisted the Receiver in its efforts to recover as much money as possible for the victims of his crimes.  As early as March 2009, Mr. Greenwood requested that the Receiver take all of his assets to which victims had claim, stating that he did not wish to stand in its way.  And in the more than five years since his arrest, Mr. Greenwood has worked with the Receiver on a consistent basis to maximize recovery from the liquidation of all business and personal assets.

This memorandum and the attached 84 letters on Mr. Greenwood's behalf are not submitted to excuse or minimize his serious criminal conduct, but are respectfully submitted to provide relevant information regarding the circumstances of the offense, Mr. Greenwood's history and characteristics, and other sentencing factors that the Court will consider pursuant to 18 U.S.C.A. § 3553(a) (West).

███████████████████████████████

███████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████

       Mr. Greenwood, age 67, has lived a life characterized by devotion to his family, service to his community, and an extraordinary history of helping others in times of need—whether friends or virtual strangers.  As the many letters to the Court demonstrate, Mr. Greenwood's many acts of generosity and kindness began long before he began committing fraud and continued throughout the period at issue in this prosecution.  Moreover, in the five years since his arrest, Mr. Greenwood has used his talents to better the lives of many.  He has spent hundreds of hours, on a consistent basis, as a volunteer tutor to help adults with limited resources obtain their GED or certifications in nursing, pharmacy, law enforcement, or English as a Second Language (ESL).  Through this work, Mr. Greenwood has enabled numerous individuals to reach meaningful life goals that they previously thought were unattainable, including jobs and educational opportunities that but for him they would not have achieved.  He truly has made a difference in the lives of persons with whom he has worked.  Mr. Greenwood's ongoing commitment to helping others in whatever way he can—even while managing significant challenges in his own life—demonstrates his true character as a person fundamentally concerned with the well-being of others.

████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████

On these bases and additional grounds set forth in this memorandum—████████████████████

████████████████████████████████████—we respectfully submit

that a sentence of no more than five years will be "sufficient but not greater than necessary" to

serve the objectives of punishment.

I.      **THE OFFENSE CONDUCT AND MR. GREENWOOD'S ACCEPTANCE OF**
        **RESPONSIBILITY**

On February 25, 2009, after the National Futures Association had commenced its

investigation of WGTC and WGTI, Mr. Greenwood turned himself in to the FBI.  He and Mr.

Walsh were arrested and charged in this case on the same day.  ████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████.  On July 24, 2009, a six-count Indictment was

returned charging conspiracy, securities fraud, commodities fraud, wire fraud, and money

laundering.  The Indictment charges generally that, between 1996 and February 2009, Mr.

Greenwood and Mr. Walsh defrauded investors in WG Trading Company LP ("WGTC") and

WG Trading Investors LP ("WGTI") by misrepresenting the use of their investments and

misappropriating significant funds for personal use.  The Indictment additionally alleges that the

defendants, in order to conceal the fraud, issued false promissory notes to WGTI, which were listed as assets on WGTI's books.

On July 28, 2010, ███████████████████████████████, Mr. Greenwood pled guilty to the six counts in the Indictment.  In his allocution before this Court, Mr. Greenwood admitted that, beginning in 1996, he entered into an agreement with Mr. Walsh, and together they fraudulently misrepresented to investors that all of their money would be invested in a strategy called index arbitrage; in fact, they did not invest all of the money in index arbitrage.  Plea Tr. at 21-22 (July 28, 2010).  Mr. Greenwood stated that "with a large percentage of the money," he and Mr. Walsh invested according to the index arbitrage strategy as they told investors.  *Id.* at 22-23.  However, Mr. Greenwood admitted, "[w]ith another part of the money we invested in other investments that the investors were not aware of and misled the investors." *Id.* at 23.  Mr. Greenwood explained that he and Mr. Walsh had lost a great deal of money on an early investment in Signal Apparel Inc. and attempted to recover the loss "[b]y making other investments that had higher returns than the index arbitrage would give."  *Id.*

Mr. Greenwood further admitted that he and Mr. Walsh cheated investors "[o]n all the money that was lost in the other investments, in the initial investments in Signal Apparel, in other investments that were made and didn't produce the returns that we expected them to produce and in money that we took out personally for basically our own use."  *Id.* at 24.  Mr. Greenwood admitted that he and Mr. Walsh treated the money they took out of the partnerships as loans on the books of the partnerships.  *Id.*

Mr. Greenwood further admitted that he and Mr. Walsh issued inaccurate statements to investors, and he further stated that when investors asked to withdraw money, he and Mr. Walsh returned the investors' money.  *Id.* at 25.  Mr. Greenwood stated: "[I]nitially we thought we

could [make up for the shortfall] and as time went on the hole got bigger and bigger and at a point we couldn't." *Id.* Mr. Greenwood admitted that "[e]arly on, after the partnership was established and the investors had given us the money, it became apparent we couldn't give back the money we were taking out." *Id.* "We did know it for a long time and we continued to do it." Mr. Greenwood admitted to taking out in excess of $75 million for personal use. *Id.* at 26.

Mr. Greenwood understands the gravity of his fraudulent conduct during the period 1996 to 2009, and he feels deep remorse for his actions and the harm he has caused. ████████

████████████████████████████████████████████████████████

████████████████████████

██    ██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

██████████

██████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

### III.   MR. GREENWOOD'S COOPERATION WITH THE RECEIVER IN ITS EFFORT TO MAXIMIZE VICTIMS' RECOVERY

An unusual aspect of this case is Mr. Greenwood's extraordinary assistance to the court-appointed Receiver.  On February 25, 2009, Robb Evans & Associates LLC ("the Receiver") was appointed to act as receiver over WGTC, WGTI, and Westridge Capital Management, Inc. in the civil actions before Judge Daniels.  *See Securities and Exchange Commission v. WG Trading Investors, L.P., et al.*, No. 09-cv-1750 ("SEC Action"); *Commodity Futures Trading Commission v. Walsh, et al.*, No. 09-cv-1749.  The Receiver was tasked with determining investor-victims' and non-investors' claims, liquidating all assets of WGTC, WGTI, and related entities and certain personal assets of the defendants, and distributing recovered funds in accordance with the claims.

Immediately after his arrest—and more than a year before his guilty plea—Mr. Greenwood proactively worked with the Receiver to locate all relevant assets and to maximize the Receiver's recovery from their liquidation.  Mr. Greenwood took these actions because he knew he had done wrong, and he wished to return as much money as possible to investors.  As

early as March 22, 2009, Mr. Greenwood told the Receiver's representatives, Val Miller and

Brick Kane, that they should take everything—including all of his personal assets—to which

investors had a claim, stating that he would not challenge the Receiver in any way, although he

could have done so with respect to some of his personal assets.

Most significantly, in early 2009, Mr. Greenwood provided valuable advice regarding

how to maximize the return from the liquidation of approximately $7-8 billion of positions in

WGTC's hedged portfolio, which was invested according to the index arbitrage strategy.  To this

end, Mr. Greenwood spent many hours meeting with the Receiver to discuss liquidation

strategies and strongly advised that the portfolio be liquidated as a basket rather than by selling

stock and buying back futures separately.  At the time, some individuals were advising the

Receiver to liquidate stock and futures separately.  Mr. Greenwood and others stressed that

liquidating one side without the other would create tremendous risk because, while it had the

potential to result in gain, it also had the potential to cause a huge loss (perhaps $100 million or

more).  The Receiver followed this advice and recovered $811,862,414.30 from the initial

liquidation of WGTC's portfolio, a recovery of almost 85% of investors' principal.  *See* Report

of Temp. Receiver's Activities 2/25/09 – 5/22/09 at 4, SEC Action, Dkt. No. 102 (May 27,

2009).  Separately, Mr. Greenwood advised the Receiver regarding how to liquidate WGTC

holdings of common shares of NYSE Euronext and First Horizon National Corp., which together

were sold for approximately $199,300.  *See id.*

With respect to personal assets, Mr. Greenwood located and turned over everything in his

possession to the Receiver immediately after his arrest.  Moreover, Mr. Greenwood spent many

hours facilitating the liquidation of those assets in the following months and years.  For example,

Mr. Greenwood made calls and wrote letters to grant the Receiver access to a personal bank

account and a pre-fraud retirement plan.  Mr. Greenwood spent approximately 100 hours

contacting dealers, collectors, and personal contacts to promote and attract the highest bidders

for the auction of items in his home that were determined to be tainted by fraud.

In addition, beginning in early 2009 and continuing to the present day, Mr. Greenwood

has assisted Val Miller and the Receiver's Controller, Carl DeCius, with maintaining and

liquidating assets.  In the first year and a half, Mr. Greenwood spoke with Mr. DeCius

approximately every other week to offer information and advice regarding the winding up of

WGTC and WGTI, including determining what accounts existed and resolving insurance and

employee issues.  From early 2009 through the present day, Mr. Greenwood also has advised Mr.

Miller and Mr. DeCius regarding maintaining the value of the horse farm and residential

properties that Mr. Greenwood turned over to the Receiver in early 2009.[1]  These matters have

included maintenance of the properties, whether to make repairs or improvements, and locating

important documents, among other issues.  Because Mr. Greenwood was in proximity to and

familiar with the properties, he was able to provide valuable information regarding how to

preserve the value of the farm until it was sold in November 2013.  Today, Mr. Greenwood

continues to provide Mr. DeCius information regarding the residential properties that have yet to

---

[1] After his arrest in 2009, when many farm employees left to take other jobs, Mr. Greenwood helped farm employees complete the every-day tasks of running the farm.  Siobhan Latchford, a farm employee and friend, describes Paul's help:

> [O]ver the next few months he came every day that he could and scrubbed water troughs, mucked out run-in sheds and distributed hay to ponies.  He mowed fields for hours on end, he even took a turn at weed whacking . . . . He did his utmost to help us out with work that he really had no experience with and he succeeded. . . . I know he felt bad about the farm and our situation but I can't think of another person who in his position, would have rolled up his sleeves and humbled himself to do the most menial tasks on the farm alongside the rest of us.  He has always been a decent and good man but this impressed me more than anything else he had done over the years and he has done so much.

(Exh. 27 (emphasis added)).

be sold, when requested.  Linda Gracie, a real estate agent handling the sale of the residential properties as well as a friend of Mr. Greenwood, writes to the Court that throughout her time handling the sales, "Paul has been helpful, accessible and completely cooperative with every request that has been made by either the Receiver or myself."  (Exh. 64).

As a result of the Receiver's considerable efforts during the last five years and with significant assistance from Mr. Greenwood, the victims have recovered approximately $855 million of their $958.8 million in principal, or about 89.1% of their original investment.  *See* Order Granting Receiver's Request for Ext. of Time Re: Third Distribution, SEC Action, Dkt. No. 761, at 1-2 (Nov. 4, 2014).  A Court-approved third distribution of $50 million will increase the total recovery to $905 million, for a recovery rate of approximately 94.3%.  *See id.*; Order Granting Receiver's Mot. for Order Approving Third Distribution, SEC Action, Dkt. No. 698 (Nov. 19, 2013).  As of October 27, 2014, the Receiver had a fund balance of approximately $104 million.  *See* Order Granting Receiver's Request for Ext. of Time, at 1-2.

We anticipate that after final distribution to investors and settlement of non-investor claims, the victims will recover at least 99% of their original investment—an unusually high rate of recovery.  We submit that the level of Mr. Greenwood's cooperation with the Receiver is substantial and warrants consideration in his sentencing.

## IV.      MR. GREENWOOD'S PERSONAL BACKGROUND AND CHARACTER

As numerous family members, friends, colleagues, and neighbors have described in letters to the Court, throughout his life, Paul Greenwood has given generously to others in extraordinary and thoughtful ways.  Time and time again, he took the extra step to learn the problems of others and, unlike many, followed through by offering his help, whether through financial resources, knowledge, mentorship, or friendship.  An extraordinary number of persons

have written to the Court to express that Paul has meaningfully changed or even saved their

lives. ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████

### A. **Mr. Greenwood's Devotion to His Family**

In 1991, Paul married Robin Bacon, who ran a horse business at Old Salem Farm in

North Salem, NY. ████████████████████████████████████████████

███████████████████████████████████████████████ In 1995,

they decided to adopt. ████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████





**B.  Mr. Greenwood's Compassion, Kindness, and Assistance to Others**

While Mr. Greenwood's history of good works includes significant financial contributions to nonprofit and charitable organizations, it is best characterized by the help he has given—quietly and without recognition—to individuals in times of need.  Dating back to the mid-1980s and continuing into the present day, Paul has provided extraordinary and often life-changing support to others on an unusual number of occasions.  As numerous letters to the Court describe, Paul's support was more than simply financial—Paul gave generously of himself, serving as a listening ear, offering guidance, and dedicating countless hours to helping others in times of crisis.  The letters demonstrate that Paul is someone with a genuine interest in enabling others—sometimes virtual strangers—to overcome challenges and succeed in life.  Almost always, Paul's help was given out of the public eye.  As one friend writes, "[o]ne will never know how many people Paul helped in their time of need for his giving was always done in an anonymous way."  (Thomas Purdy Letter, Exh. 8).  Those who know Paul describe him as exceptionally kind, compassionate, and generous to others in times of need, whether they are individuals in crisis or financial need, youth in need of mentorship and guidance, employees struggling to achieve citizenship, or a fellow community member in need of friendship and support.

**1.  Assistance and Compassion in Times of Crisis**

Perhaps most revealing of Paul's deep humanity and compassion for others are the numerous occasions when Paul selflessly intervened to help others in times of extreme medical and personal crisis.  In 1986, Paul provided life-saving assistance to Charlie Weaver, a horse trainer at Old Salem Farm who had suffered a severe riding accident that left him paralyzed for a period of time.  Recognizing that Charlie needed help, Paul generously paid all the expenses

associated with his injury and full rehabilitation.  Brian Simonson, Charlie's longtime partner, recounts that Paul was "a great support to me in helping Charlie recover and made it possible for me to devote my full attention to the recovery."  (Exh. 9).  Charlie recovered and achieved great professional success.  Sadly, he suffered a second injury 25 years later that took his life.  Brian describes the critical role that Paul played in enabling Charlie and Brian to cope with both accidents:

> Throughout the time Charlie was in the hospital following the accident, Paul showed concern and was a supportive friend to us both.  Had Paul not been so supportive following Charlie's first injury, he would not have had the opportunity to continue his career for those twenty five years and become one of the premier horse trainers in the country.

Paul's extraordinary compassion for others was also revealed in his efforts to help █████ ████████ Reverend Suzy Post in the late 1990s.  Suzy was the pastor of Paul's church in North Salem, and she worked tirelessly for the benefit of her community.  ████████████████████ ████████████████████████████████████████████████████████████ ████████████████ She also was "mired in debt" after falling behind in student loan payments. (Donald Glascoff Letter, Exh. 11).  ████████████████████████████████ ████████████████████████████████████████████ When Paul learned of Suzy's situation, he stepped in.  Joe Dickerson, a friend and community member, recalls that Paul identified a specialty clinic and then "contributed his time to line up several folks, as well as himself, to contribute financially toward the clinic ███████████████████████."  (Exh. 10).  Paul also paid off Suzy's debts and invited her to live at his home until she improved. (Exh. 11).  Suzy poignantly recounts how Paul helped her "through the hardest time I have ever been through":

> They opened their home to me, knowing that it was hard at that time to live alone, and for my physical medical issues, Paul was there to take [me] to the doctor and

17

on more than one occasion to the Emergency Room.  With Paul's help, I got
through a difficult time feeling supported and cared about, and while I am a
Priest, it was Paul who ministered to me, and for that I will be forever grateful.

(Exh. 12).  Suzy, like many others who have written to the Court, writes that Paul is "one of the
kindest, genuine, caring and most generous" people she knows.

Frank Florenzino, ███████████████, writes to explain how Paul "played an
important part in helping to save" his life.  (Exh. 13 (emphasis added)).  In 2006, Frank was 26
and working in a North Salem restaurant ████████████████████████
████████████████████████████████████████████
█████████ ██████████████████████████████
██████████████████████████████ Paul did not know Frank, but he
learned of his struggle while dining at the restaurant where Frank worked.  Paul stepped up and
asked how he could help.  He organized a major, town-wide fundraiser at his barn, which raised
enough money to fund Frank's recovery.  (Michele Savino Letter, Exh. 14).  Frank explains the
significance of Paul's help and especially remembers "how kind and genuine" he was:

> I had never met him before I only knew of his reputation of being a kind man and
> an active member of the community.  He asked me if there was anything he could
> do to help.  I thanked him for his kind gesture but declined his offer.  He must
> have realized that I was being modest and knew that I was in need.   Mr.
> Greenwood took it upon himself to contact my family and my employer.   He
> offered to host a fundraiser for my benefit at his property.  With his help a large
> sum of money was raised to help pay my medical bills.  Mr. Greenwood had
> become like father figure for me.  He was constantly checking up on me and
> making sure I was ok.  It was comforting to know that he was behind me.  I knew
> he was going to make certain that I received the treatment I needed to get better.

(Exh. 13 (emphasis added)).

Paul's extraordinary compassion and generosity is again depicted in a letter from
Kenneth and Jami Adams, who describe Paul's extensive efforts to avert personal and financial
disaster for their family.  (Exh. 15).  ████████████████████ ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ Paul did not know the Adamses but learned of their crisis after being elected Town Supervisor.  Once again, Paul devoted himself to helping.  Acting as a selfless advocate for them, ████████████████████ ████████████████████████████████████████.  The Adamses recount that Paul "bent over backwards to help us and I'm not quite sure what we would have done or where we would be if it wasn't for his kindness.  And the thing that means the most as that he came to me and asked how he could help." ████ ████████████████████████ ████████████████we are eternally grateful to him and will always consider him a friend." (Exh. 15 (emphasis added)).

Person after person recounts instances in which Paul selflessly provided critical support to others in times of crisis, when they needed it the most.  The following are a few examples:

- Paul provided financial support to Anthony Lisi when a car accident in 2002 left his daughter, just turning 16, in a coma.  (Anthony Lisi Letter, Exh. 16).  To help with mounting medical costs, the community organized a fundraiser.  Anthony writes that "Paul, being the thoughtful, generous and selfless person that he is, donated the sum of $10,000.  To this day, <u>words cannot express the gratitude I have and the impact of his actions on my family's life</u>."  (Exh. 16 (emphasis added)).

- Ann Morris describes Paul's generosity in 2001 when she ████████████████████ ████████████████████████ (Exh. 17). ████████████████████████ ████████████████████████████████ Ann writes: "I will be forever grateful and appreciative for Paul's concern, thoughtfulness, and kindness."

- In 2007, Jill Murphy ████████████████████████████████ ████████████████████████ (Exh. 18).  Jill explains how Paul donated generously with no benefit to himself "except for my gratitude to get me back on my feet."

### 2. Support in Times of Personal or Financial Difficulties

Numerous letters—more than can be mentioned here—describe Paul's efforts to help others successfully cope with personal and financial struggles, most often without being asked to do so and without any recognition for his deeds.  Letter after letter describes the tremendous impact that Paul has had on others through these acts.  Rosemary DeAngelis writes that Paul provided crucial advice, financial support, and friendship in 2002, when she had been living with mold for six months because her landlord refused to take action.  (Exh. 19).  Lacking funds to secure a lawyer or alternative housing, she sought Paul's advice.  When testing revealed high levels of toxic mold throughout her home, Paul insisted that she vacate her apartment and either live with him and Robin or temporarily move to a hotel.  Rosemary conveys just how much Paul's assistance, at a time when she had nowhere to turn, has meant to her:

> Paul gave me financial assistance so that I could continue to remain at my temporary residence and secure a lawyer.  He was kind and generous while also being strong and supportive.  Paul was there for me when I had nowhere to turn. Eventually, all the issues were resolved and I am very grateful for Paul's intervention on my behalf.

> Similarly, Paul's commitment to helping others is reflected in his selfless efforts to save

Shari Tricarico, ███████████████████████████████████, from eviction in 2001.  (Exh. 20).  Paul secured a lawyer to work on Shari's eviction case at no cost.  Even more, when Shari was unable to find an affordable home in her son's school district, Paul purchased a home in the right district and rented it to Shari at her previous rent.  Shari poignantly describes the critical importance of Paul's assistance at that time:

> I have worked hard to bring up my children to be responsible, contributing adults (which they have all become).  The world is not often kind to single mothers, and sometimes people need some additional help beyond their own abilities.  Paul was there to help my family and I when we needed it the most.  He has always treated me with dignity and respect.  I feel that the service and help he has provided to me

> was truly heaven-sent.  I am grateful to Paul for the guidance and assistance he
> gave our family.  He is a good man.

(Exh. 20 (emphasis added)).  As Donald Glascoff, the lawyer for Shari's case, remembers, Paul's

motivation for preventing Shari's eviction and finding her a home was simply "to help her and

her son in a moment of crisis."  (Exh. 11).

Further demonstrating Paul's character, Marilene Pereira, Paul's former housekeeper,

writes that Paul provided significant emotional and financial support in 2007 when her daughter

was suffering from serious health issues: "They offered all the emotional support by allowing me

time off of work to discuss with doctors what was occur[r]ing with my daughter.  They also

offered financial support I would need to pay no matter the doctor or office my daughter would

have to visit."  (Exh. 21).  Marilene will always remember how Paul comforted her, with tears in

his eyes, stating: "Robin and I consider her to be a child of ours as well, just as you are family to

us so is she.  Anything we can do to help you and her we will do, without reserve."  (Exh. 21).

On other occasions, Paul played an invaluable role in enabling those around him to

succeed, proactively creating opportunities for others and providing key mentorship.  In each

instance, Paul never expected anything in return.  He acted simply with the desire to see others

succeed.  In the early 1980s, Paul helped John Debany, the brother of an employee.  John was

mildly mentally disabled but undiagnosed; as a result, he graduated from mainstream high school

with a second-grade reading level.  (Alice Debany Clero Letter, Exh. 22).  Despite his

extraordinary work ethic, John was unable to find a long-term job due to his disability and

resorted to work in which he was exploited.  Paul selflessly helped change John's life by offering

him a good job, with healthcare.  John's sister Alice Debany Clero recounts how Paul, through

these acts, meaningfully bettered the life of her beloved brother:

21

> Thanks to Paul, John worked 5 days a week, he had an excellent salary fit for his hard work, and he had healthcare.  He had time to pursue his hobby, which was trail riding, and he also got married.  John's life was cut too short by his cancer, and I remember Paul and his wife, Robin, at his funeral mourning him alongside my family.

(Exh. 22).

So many of the letters submitted to the Court depict similarly moving examples of how Paul, seeing others in crisis, sought to help and became a selfless advocate.  We cite here just a few additional examples of his compassion and generosity on behalf of others:

- In 1982, Paul helped a farm employee who wanted to start a manure business by going into business with the employee and providing a truck.  (James Greenwood Letter, Exh. 3).  Paul knew it was a way for him to get ahead in life.  "Paul's assistance allowed the worker to build a good business which the man later sold and did quite well.  Paul never took any of the profit."  (Exh. 3).

- George Zabrecky writes that Paul has been instrumental in his success as a physician and researcher.  (Exh. 5).  In 1987, George was struggling to make ends meet with his practice.  On Robin's suggestion, George sought advice from Paul, a stranger at the time.  George recounts how Paul spent hours learning the details of his business and advising on how to make it profitable.  Paul also provided crucial funds to keep the business afloat until things improved.  Over the next year, George writes, "with the funds provided by Paul and his support and guidance, the office schedule was completely booked and as a business we became (and have remained) successful."  (Exh. 5).

- In 1989, Patricia Hitchcock's husband passed away unexpectedly at the age of 59, at the same time that she lost her job.  (Exh. 23).  Paul kindly offered Patricia a job in Old Salem Farm's office, which provided her much needed work for two years.

- In 2004, Marilene Pereira's husband, Valdir, lost his job when his employer went out of business.  (Valdir Pereira Letter, Exh. 24).  Paul created a job for Valdir at his barn until Valdir could find long-term employment.  Paul continued to advise Valdir and ultimately helped him find a new job that led to future opportunities.

### 3.  Financial Assistance to Support Educational Pursuits

Powerful demonstration of Paul's innate desire to help others is the college education he provided for young persons who otherwise could not have afforded it.  For each of these persons, Paul also provided mentorship and guidance to help them succeed.  Alice Debany Clero, who

today considers Paul to be "like a father," recounts how Paul supported her 30 years ago in a way that changed the course of her life and career.  (Exh. 22).  At the time, Alice was 17 and working as an apprentice horseback rider 

Even further, Paul decided to help in an extraordinary way: he offered Alice a job and the opportunity to go to college.  Alice writes:

> I somehow knew that Paul was the right person to confide in.  He was fatherly in his concern and he gave excellent advice . . . .  He also had an open door at his stables and would provide me with a job as soon as I needed one.  <u>He also offered me a life changing proposal: if I worked for him, he wanted me to go to university and he would pay for all of my tuition.</u>

(Exh. 22 (emphasis added)).  With Paul's support, Alice attended New York University for five years while working full-time.  At every step, Paul mentored Alice, reading her school papers and offering advice.  Alice explains: "Thanks to all of the opportunities Paul gave to me, and most importantly, an education, I have had a very successful career in the Equestrian world."

Paul similarly provided life-changing assistance to Scott Hofstetter in 1987, when Paul hired Scott to work at Old Salem Farm.  (Scott Hofstetter Letter, Exh. 25).  Recognizing that Scott did not have the resources to attend college, Paul generously offered to fund his college education.  Scott, who today is a successful equestrian trainer, remembers Paul for his kindness so many years ago: "Without the financial support from Mr. Greenwood, I would not be able to provide help and support to other[]s as I am able to today."  (Exh. 25).

Again in the early 1990s, Paul acted with compassion and generosity when he paid the medical school tuition of George Zabrecky, a new friend at the time. Paul helped because he knew that without this support, George, who had a family to support, would be unable to attend medical school. (Exh. 5). George recounts the critical support role that Paul played in his life in the following years: "Over the years at medical school whenever I was in doubt about continuing, I would speak with Paul. His support was instrumental in my completing medical school. <u>Graduation would not have been possible without his personal and financial support</u>." (Exh. 5 (emphasis added)).

In 1998, Paul generously paid the college tuition and living expenses of Jessica Perry, ███████████████████████, who had not received anticipated financial aid. "Without this assistance, I am unsure how I would have been able to receive the education that I did," Jessica explains. (Exh. 26). In April 2002, when Jessica and her new husband were struggling to support themselves as students, Paul again made a "tremendously kind offer" and gave them a wedding gift sufficient to pay tuition that year. (Exh. 26). Paul's selfless and extraordinary efforts to help Jessica, George, Scott, and Alice powerfully demonstrate his deep devotion to helping those around him succeed, even when they are virtual strangers. In each instance, Paul's assistance was offered in confidence, without the expectation of any benefit or recognition.

### 4. Assistance to Employees Seeking Citizenship

Letter writers describe Paul's extraordinary efforts to help immigrant employees with their citizenship and residency problems. For example, in the late 1980s, Paul was instrumental in Siobhan Latchford's green card application by sponsoring her and guaranteeing her a job. (Exh. 27). In the 1990s, Paul helped Edgar Bustamante, a farm employee with limited means, to move his wife and kids from Venezuela to the United States. (Edgar Bustamante Letter, Exh.

28).  Acting with compassion and generosity, Paul provided Edgar's family a home, helped

enroll his daughters in elementary school, and sponsored the family for residency.  By living in

that home for four years, Edgar's family was able to save for their own house.  Edgar recounts:

"I will never forget the time when [my wife] tried to help [Paul] pay for the additional energy

costs, Mr. Greenwood insisted that we save that money for our house."  (Exh. 28).  Edgar

emphasizes the extent to which Paul's help has set his family on a path to success and happiness:

> Mr. Greenwood was always supportive and happy for our achievements but I am
> most grateful for his decision to sponsor me for my legal residency.  His decision
> helped shape my daughters' futures and opened doors for the opportunities my
> wife and I sought and worked hard to ensure for them.
> [omitted]
> My family and I will forever be grateful for his generosity, kindness, financial
> support and guidance.  His positive attitude and encouragement helped my family
> succeed and live happy lives; we will always be indebted to his benevolence.

(Exh. 28 (emphasis added)).  Even further, Paul provided support when Edgar's daughter,

Karina, was a college student at Fordham University and her scholarship was revoked due to an

unforeseen delay in her residency process.  (Karina Bustamante Letter, Exh. 29).  Paul loaned

Karina's parents $6,000 to cover her expenses.  "When my father and I attempted to repay the

loan, Mr. Greenwood refused to accept the money, insisting it was more important that I invest it

in my future education," Karina writes.  (Exh. 29).  Today, Karina believes that Paul's support,

both material and otherwise, has been instrumental in her life: "Without Mr. Greenwood's

assistance I may not have enjoyed the freedom and success I have experienced as a proud

graduate of Fordham University and a United States citizen."

Paul also supported the legal residency of Manuel Tovar Gaytan, an employee at Old

Salem Farm and Grand Central Farm.  (Manuel Tovar Gaytan Letter, Exh. 30).  In the late 1990s,

Paul sponsored Manuel's temporary work visa until he was eligible to apply for a green card.

Paul paid the fee for Manuel's green card application, provided a lawyer, and, most importantly,

guaranteed him a job.  Years later, when Manuel was having trouble securing a visa for his wife, Paul supported Manuel by allowing him to travel to Mexico to see her when he wished.

Even after his arrest, Paul has provided meaningful non-financial assistance to Everardo and Maria Mondragon, two employees of Robin's horse business in North Carolina, in their struggle to secure legal residency.  (Exh. 31).  In her letter to the Court, Maria writes that Paul went out of his way to help her find proof of birth in Texas, helped her secure a lawyer, and drove her to every appointment, sometimes 90 miles away.  (Exh. 31).

### 5.  Acts of Kindness to Friends and Employees

Numerous letters from friends movingly describe Paul's deep devotion to and compassion for his friends, in times of need as well as on an everyday basis.  The excerpts below offer just a few examples of how Paul has touched the lives of those close to him.

- Michelle Dickerson, a close family friend, describes how Paul's "patience and support" in spending many hours tutoring her and her husband helped them succeed in college. (Exh. 6).  Paul also offered crucial life advice, treating them as his own children: "My husband and I look to Paul often when it comes to life's big choices.  We welcome and appreciate his knowledge and guidance.  He truly takes care of us and treats us as if we were his own children, wanting only the best for us."

- Richard Hammer remembers that Paul was a true friend during his divorce in 1995 and subsequent reconciliation and remarriage to his wife in 2001.  (Exh. 32).  "Paul during those years proved to be a true friend and was always there to provide support and helped me to confront my own issues; and through his efforts showed me there was a path back to the woman I loved.  His generosity of spirit and his selfless desire to see us reunited helped me to change the trajectory of my life and find my way back to my wife."

- 

- Siobhan Latchford, a longtime friend and employee, explains that ███████████ ███████████████ (Exh. 27).  Paul "immediately told me not to worry about a thing, that they would be there for me and I only had to ask for anything I needed."

"[K]nowing how supportive Paul and Robin were was a big factor in keeping my recovery stress free."

Further demonstration of Paul's caring and thoughtfulness are Paul's repeated efforts to support friends' career ambitions. In the early 1990s, Paul helped Bill Bradley's veterinarian practice by providing funding for an expensive piece of diagnostic equipment. (William Bradley Letter, Exh. 34). Bill recalls: "Paul didn't ask for any more than a handshake for collateral and helped fund that project back when I doubt that I could have gotten it off the ground without that help. I paid him back pretty much as I got around to it without ever having him mention it." (Exh. 34). Similarly, Marty Goldstein, a veterinarian and a friend of 30 years, describes how Paul was one of the "key figures" that helped him through "decades of ridicule and condemnation from my peers along with fears and financial hardship," which Marty experienced due to his work in alternative medical therapy. (Exh. 35). And when Marty's company met financial disaster in 2003, Paul pledged a large sum of money until new funding could be secured. Marty writes:

> When I think about Paul, there's one word that always come to mind: Responsibility. I could ALWAYS count on Paul to be there; to keep his word, to answer a call, to be on time, to deliver or answer to any agreement made, and always with such a high degree of knowledge, intelligence and wherewithal.

Impressive also is the unusual kindness and thoughtfulness Paul has consistently shown to his employees, many of whom have written to the Court to describe Paul's compassion and generosity. Lady Post Wright worked at Old Salem Farm in the 1980s and remembers that Paul was "a very fair, kind and generous employer," especially when she was involved in a heartbreaking relationship and began drinking heavily. (Exh. 36). "Paul took me aside and strongly encouraged me to get help, which I did and am forever grateful to him for that guidance." (Exh. 36). Tim Taylor, who worked on construction projects for Paul beginning in

27

1995, writes that Paul was always "fair and open" in his dealings with him, and their work relationship extended into friendship.  (Exh. 37).  Tim remembers that Paul was "generous to the construction staff, buying pizza for anyone on site at Friday lunch for years at a time," and often asked about sick family members.  Hayleng Tea, a painter who began working for Paul in 1995, writes that Paul "has been nothing but friendly, loyal, inviting, personable, and selfless.  Most of the people I work for wouldn't care about my personal life, my well-being, or my happiness but there has never been a time Mr. Greenwood has not stopped by without saying hello, asking me how I'm doing, and asking me about my family."  (Exh. 38).

These letters, and many more, illustrate the kind of person Paul was on an everyday basis, when no one was looking—he was a kind, thoughtful employer and friend who cared about the well-being of others, always looking for ways to help.

### 6.   Mentorship and Support to Enable Others to Pursue their Goals

Paul for much of his life has been keenly interested and involved in equestrian life, well before his fraudulent conduct.  Admirably, consonant with his innate quality of helping others are the efforts he has made in the equestrian world to help financially disadvantaged and even disabled persons realize their goals and ambitions in a field that has been so important to their lives.  As many letters describe, Paul made a tremendous impact and always will be remembered for his generosity.  As one friend writes, Paul "was an integral part of these young kid's lives, he made a difference by allowing them to reach their full potential."  (Sorcha Hallinan, Exh. 39).

Gary Rockwell describes how "[t]wenty-two years ago Paul Greenwood did me an enormous favor that affected my whole career."  (Exh. 40).  At the time, Gary was a young professional rider, and his clients stabled horses at Old Salem Farm.  When the owner of his best horse went bankrupt, Paul stepped in to help:

> Paul, recognizing that my future was falling out from under me, bought the horse, allowing me time to repay him shortly afterward. Then, knowing that I would be overwhelmed with the expense of campaigning the horse internationally, he offered to sponsor me with the horse and did so for the next few years.

(Exh. 40). With the horse, Gary became an alternate for the 1992 Olympics and won a bronze medal at the 1994 World Championships. Gary speaks for many when he describes Paul's efforts to see him succeed: "Paul is one of the few that I have known whose efforts resulted in success for others while he remained in the background. For the help that he gave me, he asked for NO acknowledgement, no credit, and no 'thank you.' " (Exh. 40).

Paul similarly enabled Mia Handler to pursue her dream, since the age of 10, of becoming a rider, when her family could not afford the steep fees. (Mia Handler Letter, Exh. 41). In the late 1980s, Mia's mother, Susanne, was facing significant financial difficulties as a single mother with two young daughters. Susanne explains that Paul "very kindly allowed one of my daughters (Mia) and me to work and freely use the wonderful riding facilities" at Old Salem Farm. (Exh. 49). Paul gave Mia a horse to ride, paid her entry fees in horse shows, and became her mentor. Mia describes the profound impact that Paul has had on her life:

> If I had to describe Paul I would describe him as generous, genuine and kind. . . . The experience he allowed me to have with competing horses, and throughout my riding career, has left a permanent impression on me. Why is this important? It is important because everything from the conversations we would have on horseback to his generosity, support and advice helped to shape me into someone who would persevere, make the best out of a situation and helped me all the way through medical school. He was and remains someone I would go to for advice or guidance.

(Exh. 41). Paul also performed a "life changing act of kindness" for Suzanne Kuroghlian. (Suzanne Kuroghlian Letter, Exh. 42). At 15, Suzanne aspired to ride in national competitions, but her mother struggled to make ends meet and could not provide the necessary fees. Paul recognized

her desire and, in 1987, gave her the "incredible opportunity" to show and train with one of his horses. (Exh. 42). Without telling Suzanne, Paul waived the annual lease fee of $25,000 so that she could pursue her dream. Years later in 2002, Suzanne learned of Paul's kindness: "Just prior to the loss of my mother, I learned from her how giving and unselfish Paul was by waiving that fee back in 1987. His generosity truly allo[wed] me to enter the horse show world professionally and confidently. He never made my mother feel guilty for waiving that lease fee nor did he ever approach me upon this matter." (Exh. 42). Suzanne adds: "Paul has shaped my life and . . . he has most certainly touched so many other lives, including my mother's along the way." Similarly, Susan Hellman writes that beginning in 1985, when she was 12 years old, Paul provided her mentorship, financial support, and friendship that ultimately enabled her to pursue her dreams as a horse trainer. (Exh. 43).

Paul enabled Wondrous Burns to pursue a different kind of dream. In the late 1980s, Wondrous met Paul at Grand Central Farm while she was working as a nanny for a family that owned a house near the farm. Wondrous explains that she is disabled, having contracted polio as an infant: "My family was not able to afford medical care or leg braces. I received my first leg brace when I was a young adult." (Exh. 44). Paul invited Wondrous to take free riding lessons, and she discovered that she loved riding. With Paul's sponsorship, Wondrous even participated in the Paralympic Games in the 1980s. In her letter, Wondrous describes the immense significance of these riding lessons in her life:

> The riding lessons were important to me because riding showed me that I, as a disabled person, could do what other people could do. Riding gave me confidence and dignity. Riding has meant everything to me. I don't believe I would have been introduced to riding if Mr. and Mrs. Greenwood had not given me the opportunity because no other riding schools took disabled students at that time. The teachers at Grand Central Riding Farm took the time to show me how to ride with my disability.

30

C. **Commitment to Community**

1. **Commitment to Non-profit, Charitable, and Public Service Organizations**

In addition to helping others throughout his life, Paul has been deeply devoted to a broad range of charitable activities since the 1980s. His extensive commitment has been impressive in terms of donating both his time and financial resources. Since 1990, he has "worked tirelessly" for Friends of Karen, an organization that gives emotional and financial aid to families with children suffering from cancer. (Jacalyn Kamenstein Letter, Exh. 45). Jacalyn Kamenstein describes how Paul's "door to door appeals to help these children were impossible to deny" and that Paul's devotion and contributions to the organization, including organizing and hosting successful fundraisers, "significantly enhanced" its mission. (Exh. 45).

Lois Adamsen recalls that Paul over the years was a consistent financial resource for the North Salem food pantry, which was often short of funds: Paul "assured us that he would help when[]ever we were in need and indeed he did. We hesitated to go to him but he was always gracious and helpful and we had ample funds to feed our 'clients.' " (Exh. 46). Also impressive was his work for the Westchester Mental Health Association (WMHA), which instituted school programs on domestic violence and dating abuse and worked with victims in court: "One phone call to Paul and he was an eager supporter, not only with a generous donation but with heartfelt concern." (Exh. 45).

Volunteer fire and ambulance services are critical to the functioning of local communities. Paul's efforts here also were exceptional. Since 1980, he has raised and donated money for the North Salem Volunteer Ambulance Corps and provided instrumental support for the construction of the Corps' permanent residence. (Hitchcock Letter, Exh. 23). Similarly, Paul's generosity to the Croton Fall Volunteer Fire Department since the early 1980s has been

"tremendous."  (Robert Daros Letter, Exh. 47).  In 1992, Paul hosted a successful fundraiser

rodeo at Old Salem Farm that raised significant funds for the Department.  (Exh. 47).  Paul also

has taken great interest in improving North Salem's local library since at least 1993, serving on

the Board of Trustees and as treasurer and by fundraising and making significant contributions

that funded the addition of a children's wing.  (Exh. 45).  Notably, Paul helped the library

recover from a financial crisis: "[Paul] worked tireless[ly] to update our financial reporting and

audit procedures.  Within two years we were operating on a sound financial basis and his

procedures are still being followed today."  (Purdy Letter, Exh. 8).

 Outside of his community, Paul made a major contribution to the Metropolitan Museum

of Art in the early 1980s by creating a computerized database for the American Wing collection.

(Amy Greenwood Letter, Exh. 4).  At a time when the collection was in disarray and libraries

were only beginning to use computers, Paul created a computer catalog that linked images of

objects in the collection to keywords, enabling researchers to conduct searches.  "No one had yet

linked images with keyword data, or any data for that matter."  (Exh. 4).  Paul's sister Amy

recalls that Paul "donated many hours designing and writing the program" and also donated

computers for the staff, curator and the public.  (Exh. 4).

 **2.  Commitment to Church Community**

 For years, Paul was deeply involved in the St. James Episcopal Church ("St. James") in

North Salem.  Characteristically, he took a special interest in helping community members in

need.  Suzy Post, a former reverend of St. James and Paul's friend since 1994, remembers calling

upon Paul to help a family in crisis on numerous occasions.  (Exh. 12).  "Paul's generosity in

times of crisis was a true blessing, not only to me but to many members of the parish that he

never even met," she recalls.  Suzy describes how she will never forget Paul's compassion for

others and his generosity with his time:

> Paul contributed so much time to the parish, and having him a part of the
> community was a true blessing.  Paul was always there to help with his time, and
> do whatever he could as a committed parish member.  As a Priest I will never
> forget his strong faith and what a wonderful addition Paul and his family were to
> the congregation.  . . . . [T]o this day I have [never] and never will forget the help
> he gave to the Church and community.

(Exh. 12).  Suzy recounts one occasion when a family lost their home in a fire and became

homeless.  Suzy found help in Paul, who arranged for a temporary home: "Paul's financial help

and knowledge of the best way to get them the help they needed was invaluable to me."

In 1997, Joe Dickerson was devastated when he learned he was too old to become a

priest, a lifelong dream that he had delayed to support his family.  (Exh. 10).  Paul did not know

Joe well but offered his support to help him move past the crisis.  Joe explains that Paul's

support meant the world to him:

> To say I was devastated would be an understatement.  I was hurt so badly that I
> not only gave up my church but also my God.  My family and friends were
> worried about me – but it was Paul Greenwood, an acquaintance from church,
> who came to see me and despite our not really knowing each other took time to
> reason with me and logically work thru my problem.  That a man with his
> responsibilities would make the effort to meet with a virtual stranger and do what
> was necessary to literally save me was the beginning of our friendship.

In addition to helping parish members in need, Paul contributed to the St. James

community by improving the church's financial health.  Paul served as a leader on the church's

governing body and as treasurer.  According to one parish member, Paul was "crucial to the

growth and health of St. James," in part by stabilizing the endowment fund, bringing sustained

financial health, and balancing budgets.  (Jack Herr Letter, Exh. 50).  "Paul instilled at St. James

a sense of the importance and the actual practice of using all the parish's financial resources

prudently." (Exh. 50). At St. James, Paul is remembered for selflessly serving his community and working with all members as equals, regardless of background.

### 3. **Public Service as Town Supervisor of North Salem**

In 2007, Paul was elected Town Supervisor of North Salem (the equivalent of mayor), with a large majority of the vote. During his term, Paul declined a salary. Letter after letter from North Salem residents describe the lasting, unprecedented impact that Paul made during his term. Paul's most important contribution was his work to improve Peach Lake which, despite its name, was a less affluent area of town that had suffered from pollution and serious sewage problems that adversely impacted the lives of the area's residents for many years. It had been designated an "impaired water body," and surrounding homes had serious septic problems. (Frances Ott Letter, Exh. 51). Studies showed that a sewer system was needed to eliminate health risks but, for years, nothing was accomplished despite residents' efforts. (Peggy Boyle Letter, Exh. 52). As town supervisor, Paul immediately took steps to get the job done: he commissioned a study to assess needs, met with environmental groups, and spoke with local officials. (Exh. 51). Frances Ott, a resident of Peach Lake, explains that Paul always will be remembered for helping save Peach Lake:

> Although Mr. Greenwood was the supervisor of the town, Paul worked as a member of the Coalition. Paul even went door to door with a group of residents, on a cold snowy winter evening to collect signatures for the approvals that were necessary to continue to move this project forward. Paul Greenwood really cared about this community.
> The end result is that Peach Lake finally has a wastewater treatment plant, that would not have happened without Mr. Greenwood[']s skillful intervention.

(Exh. 51). Peggy Boyle, also from Peach Lake, writes that Paul's deep commitment, authentic concern, and enthusiasm for saving the lake was especially meaningful because:

> [Paul] was determined to reach out and help residents from the poorer sections of his town. His mission and drive and vision to keep our community and lake

environmentally sound and secure will never be forgotten, nor will his humanity and decency to us personally.

(Exh. 52).  Peggy adds: "We could not have saved our beloved lake without [Paul]."

Indeed, Lois Lippmann, a former town supervisor, believes that Paul accomplished something that preceding supervisors were unable to do: he pulled together a deeply divided town for the first time in 40 years and possibly ever.  (Exh. 7).  She writes:

> Paul wasn't in office two days when he had a meeting of all the town employees and asked them to tell him the good and the bad of working in town hall, what could be done to make their jobs more meaningful, what could be done about the town split.  The meetings continued on a regular basis[.]

Brian Gracie, a North Salem resident, adds: "we continue to benefit from the feeling of unity which he instilled."  (Exh. 53).  James DePaoli, an employee of North Salem during Paul's term, writes that Paul "made all employees feel like a personal friend."  (Exh. 54).  "I always felt like he genuinely cared for me and my issues," he writes.

As town supervisor, Paul demonstrated a strong interest in helping employees, as he did when he intervened to save the job of a truck driver employed with the town.  Warren Lucas poignantly recalls an incident in which an employee who had a drinking problem was caught drinking and driving.  (Exh. 55).  Although the town board believed he should be fired, Paul disagreed and believed the employee needed help.  Paul met with him, got him into a treatment program, and worked to allow him to keep his job on the condition that he meet certain goals.

### D. Post-Arrest Volunteer Work

Paul's continued and significant service to others following his arrest demonstrates the extent to which helping others is ingrained in Paul's character—indeed, it is something he loves to do.  Throughout the five years since his arrest in 2009, Paul has volunteered his time as a teacher to help adults facing significant hurdles in life meet educational, professional, and

personal goals that they previously believed were unattainable.  Often, Paul's commitment to his

students went beyond the classroom—in North Carolina alone, Mr. Greenwood estimates that he

has spent over 3,000 hours helping his students work toward their goals.

From 2009 to 2011, while still living in North Salem, NY, Paul volunteered as a

computer skills and GED teacher, with an emphasis on math, at Safe Harbors of the Hudson in

Newburgh, NY.  Safe Harbors is a nonprofit that provides affordable housing, education, and job

skills to adults in need, including the formerly homeless, veterans, and individuals with a mental

health diagnosis.  (June Henley Letter, Exh. 57).  June Henley, the Director of Tenant Services,

describes Paul as "a very compassionate person" who worked closely with students, including

one student struggling with learning disabilities:

> One tenant, Mr. William Ford, started in our GED class in his late 60's with
> undiagnosed learning disabilities.  Mr. Ford took the GED exam several times,
> missing only in the Math section.  Paul tutored him diligently and patiently,
> working with him for many months.  Mr. Ford finally passed his GED exam and
> is now enrolled in the local community college, thanks in part to the efforts of Mr.
> Paul Greenwood.

(Exh. 57).  During the same period, Paul was a volunteer teacher in basic computer skills at a VA

Hospital in Montrose, NY, and a VA facility in Danbury, CT.

Since moving with his family to North Carolina in 2011, Paul has served approximately

20 hours a week as a volunteer tutor at Moore County Literary Council ("MCLC") in Southern

Pines, NC, which serves illiterate and low-literate adults.  (Beth Daniels Letter, Exh. 56).  At

MCLC, Paul tutors students in literacy skills and to help them obtain GED or professional

certification in nursing, pharmacy, and law enforcement.  As of May 20, 2014, Paul had

contributed over 471 hours tutoring students in literacy programs[2] and an additional 408 hours

---

[2] Because MCLC logs volunteer hours only for literacy programs, this total number of hours
does not include hours that Paul spent tutoring students for professional certifications.

*outside of the classroom* further assisting these students.  (Exh. 56).  Beth Daniels, MCLC's

executive director, describes many ways in which Paul helped his students reach their goals.

Paul tutored an older student every week to prepare her for an exam required to start a new

career in pharmacy; with Paul's help, she passed.  (Exh. 56).  Paul worked "diligently" with

another student—recently laid off from a plant closure—to help raise his reading level so that he

could pass an entrance exam for law enforcement.  When he learned that the community college

could not accommodate the student, Paul researched and found a comparable program within

driving distance.  "After confirming that the new program would work for his student, Paul made

sure that his student was adequately prepared to pass the entrance exams."  Beth describes Paul's

service to his students at MCLC:

> In all of our interactions with Paul he has acted with the utmost professionalism
> and with great compassion towards his students.  He has repeatedly gone out of
> his way to assure that his students achieve their desired goals.  <u>As a direct result
> of Paul's efforts, seven adults in Moore County now have immeasurably better
> lives than they did prior to studying under his tutelage</u>.  (Emphasis added).

One of Paul's students, Pastor Rose Spellman, met Paul in 2013 when she went to the

MCLC for help with passing a test to become a Certified Nursing Assistant.  (Rose Spellman

Letter, Exh. 58).  Paul encouraged Rose to believe in her learning ability.  Like so many others

that Paul has helped out of the generosity of his spirit and desire to help others, Rose writes, Paul

"changed my faith in myself."  He also served as friend and counsel to Rose beyond the

classroom.  When she was sick, Paul offered to drive her to the doctor; and when she moved,

Paul offered to help.  Rose writes: "Paul Greenwood is a person that has shown me to be a caring

friend, a great listener, a wonderful teacher and has a lot to give people in his service to this

community.  He has made a great impact on my life."  (Exh. 58).

37

In his post-arrest volunteer efforts in New York, Connecticut, and North Carolina, Paul has worked with a wide variety of individuals—including veterans struggling to readjust to society, individuals in financial crisis, and adults with learning disabilities—and he patiently and persistently worked with them to improve their skills, overcome hurdles, and reach key milestones.  Acting with sincere interest in helping his students reach their goals, Paul has made a major—including, in some cases, life-changing—difference in their lives.  Paul's significant service to others since his arrest underscores how helping others is inherent to his character.

## V.    OBJECTIONS TO THE PRESENTENCE REPORT

The Presentence Investigation Report (PSR) dated November 6, 2014 contains a number of inaccuracies relevant to the financial condition of Mr. Greenwood and Robin Greenwood. The following are our objections to the PSR:



1)  Paragraph 64

2)  Paragraph 74

3)  Paragraph 74

4)  Paragraph 74

5) Paragraph 74,

## VI.   APPLICATION OF THE ADVISORY SENTENCING GUIDELINES

### A.   Calculation of the Advisory Sentencing Guidelines

The base offense level is 7 points.  U.S.S.G. §§ 2S1.1(a)(1), 2B1.1(a).  The offense level is increased by 8 points as follows: ten or more victims (+2); receipt of more than $1 million in gross receipts from a financial institution (+2); and violation of securities law by a defendant who was a broker-dealer (+4).  *See* § 2B1.1(b)(16)(A), (19)(A).  The offense level is increased by 1 point pursuant to § 2S1.1 (b)(2)(A).

The offense level is increased by 30 points because the loss amount for purposes of the Guidelines exceeds $400 million.  § 2B1.1(b).  For Guidelines purposes, the loss amount is the greater of actual or intended loss, and actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."  § 2B1.1 cmt. n.3(A).  The Court "need only make a reasonable estimate of the loss" based on available information and taking into account a range of factors, including the "value of the property unlawfully taken."  § 2B1.1 cmt. n.3(C).  In an investment fraud case like this one, the guideline loss amount is the amount of principal invested with the defendant, reduced by the amount of principal returned prior to the crime's discovery.[3]  § 2B1.1 cmt. n.3(E)(i); *see United States v. Hsu, 669 F.3d 112, 122 (2d Cir. 2012)*(stating the Guidelines "provide that when an investor puts money into a fraudster's hands, and ultimately receives nothing of value in return, his loss is measured by the amount of

---

[3] The loss amount does not include promised interest or agreed-upon rate of return, *see* § 2B1.1 cmt. n.3(D), and a defendant's gain is only used as a measure of loss where loss cannot be determined, *see* § 2B1.1 cmt. n.3(B).

principal invested, not by the principal amount plus the promised interest or return that was never received"); *United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009) (concluding that the district court did not err in calculating loss based on victims' total $9 million investment).

In this case, a great majority of the investors' principal remained invested in WGTC's hedged portfolio when the crime was discovered, such that the Receiver was able to recover $812 million by liquidating the portfolio between March and May 2009.  As a result of the Receiver's continued efforts, the investors are expected to recover 99% of their principal, as explained earlier.  In this respect, this case is unlike *Hsu* and *Byors*, in which victims were left with "nothing of value" when the fraud was uncovered because their principal was squandered and in which the defendants never invested the majority of their principal.  *Hsu,* 669 F.3d at 122(defendant ran a Ponzi scheme with no legitimate investments); *Byors,* 586 F.3d at 226(defendant used substantial investor funds for personal expenses rather than investments).

The fraud guideline, however, does not provide a credit against loss where the victims' principal remains with the defendant when the fraud is discovered.  *See United States v. Vilar*, 729 F.3d 62, 95 n.34 (2d Cir. 2013) (finding that the loss amount could not be offset by funds frozen in the fraudulent investment firm's accounts, because those funds were not designated as collateral for a debt owed to a victim).

The amount of principal that victims invested with Mr. Greenwood and Mr. Walsh, reduced by the amount of principal returned prior to the crime's discovery, is approximately $958.8 million.  Because this amount exceeds $400 million, the loss enhancement is 30 points.  § 2B1.1(b).  With a three-point credit for acceptance of responsibility, Mr. Greenwood's offense level is 43.  *See* § 3E1.1(a), (b).  With a criminal history category of I, the guideline sentence is life, which in this case means the statutory maximum of 85 years.

The guideline sentence is overwhelmingly determined by the 30-point loss enhancement. Without it, the offense level would be 13 and the recommended sentencing range would be 12-18 months.  With the loss enhancement, the guideline sentence is life.

**B.  The Fraud Guideline Over-emphasizes Loss Amount and Frequently Produces Inflated Advisory Sentences that Fail to Give Appropriate Consideration to Other 3553(a) Factors.**

In this case, application of the Guidelines has the absurd result of placing Mr. Greenwood in the same sentencing category as the very worst fraud offenders, like those responsible for the Enron, Worldcom, Adelphia, and Cendant frauds, which destroyed large public companies or wiped out individuals' savings.  The fraud in this case was serious and deserves punishment. However, it does not come near the fraud in those cases.  The Guidelines fail to make this distinction, in large part because of an over-emphasis on loss amount.

We respectfully submit that the advisory guideline sentence of 85 years is so unreasonable that it fails to provide meaningful guidance for determining a just punishment for Mr. Greenwood.  The extreme nature of the advisory sentence demonstrates the extent to which the fraud guideline places excessive weight on financial loss, often producing severely inflated sentences that overstate the offense and are disproportionate to sentences in other offense categories.  As stated by Judge Rakoff in *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), the fraud guideline places "inordinate emphasis" on loss "without . . . explaining why it is appropriate to accord such huge weight" on such a factor.  This "fetish with abstract arithmetic" under the Guidelines sometimes produces "absurd" results.  *Id.* at 512.  In this case, the 30-point loss enhancement overwhelmingly determines the guideline sentence: it increases the guideline sentence from 12-18 months to life.

The Guidelines intend for loss amount—"along with other relevant factors"—to measure "the seriousness of the offense and the defendant's relative culpability."[4]  U.S.S.G. § 2B1.1 cmt. background (2013).  But by assigning extreme loss enhancements that dwarf all others, the fraud guideline effectively makes loss the only factor in determining the guideline sentence in high-loss cases.  In this manner, the fraud guideline fails to give appropriate consideration to other critical sentencing factors, in contradiction to the mandate of section 3553(a).

In particular, the fraud guideline fails to reflect meaningful differences in culpability.  As the Second Circuit has observed, there may be a "wide variety of culpability" among defendants with the same loss amount.  *United States v. Cavera*, 550 F.3d 180, 192 (2d Cir. 2008) (en banc).  The loss table fails to reflect that some culpable mental states are more blameworthy than others; for example, "[a] defendant who consciously sets out to steal or cause economic loss is more culpable and deserving of punishment than one who acts dishonestly but without the desire to steal or cause loss."  Frank O. Bowman, III, *Sentencing High–Loss Corporate Insider Frauds after Booker*, 20 Fed. Sent. Rep. 167, 171 (2008); s*ee also United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004) (noting that placing less emphasis on the loss table might allow courts to place greater significance on "greater or lesser moral culpability or danger to society" in assessing the seriousness of the fraud).  The fraud guideline also fails to account for the possibility that some forms of loss cause more harm and deserve greater punishment than others.  As Judge Underhill has explained, "A fraud that results in the loss of even a few

---

[4] The background note to section 2B1.1 (emphasis added) provides:
> The Commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes. Accordingly, *along with other relevant factors* under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline.

thousand dollars by an elderly or sick person who, as a result of the loss, becomes unable to afford the necessities of life or medical care is much more serious than a fraud that results in ten or a hundred times that loss by a large corporation able to absorb the financial consequences without a need to close plants, fire employees, or even declare the loss as material in public financial reports." *United States v. Corsey*, 723 F.3d 366, 381 (2d Cir. 2013) (per curium) (Underhill, D.J., concurring).

As noted in *Corsey*, the loss guideline is not based on empirical study[5] and, for this reason, courts "can and should exercise their discretion when deciding whether or not to follow the sentencing advice [the loss] guideline provides" and "reach the substantive reasonableness of these sentences." 723 F.3d at 379 (Underhill, D.J., concurring) (citing *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007)); *see also United States v. Mohammad*, 315 F. Supp. 2d 354, 357 (S.D.N.Y. 2003) (Lynch, J.) (noting that courts must apply the Guidelines in a way that "reflects the underlying purposes of sentencing" and must "identify variations in culpability not adequately specified in the guidelines").

Indeed, courts frequently find the fraud guideline to be flawed and reject advisory sentences on this basis. *See* Bowman, *Sentencing High–Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. R. 169 ("[S]ince *Booker*, virtually every judge faced with a top-level corporate defendant in a very large fraud has concluded that sentences called for by the Guidelines were too high."). In *United States v. Parris*, 573 F. Supp. 2d 744, 750-51 (E.D.N.Y. 2008), a securities fraud case, the court imposed a sentence of 60 months, finding the guideline range of 360 months to life "draconian" and stating that the Guidelines "[did] not provide

---

[5] The loss table was amended in 2001 and 2003 to increase offense levels for high-loss crimes in response to Congressional directives. *See Corsey*, 723 F.3d at 379 (citing U.S. Sentencing Comm'n, Report to the Congress: Increased Penalties Under the Sarbanes-Oxley Act of 2002, at 7 (2003); U.S.S.G. app. C amend. 647 (Nov. 1, 2003)).

realistic guidance."  The court explained that the case was "another example where the guidelines in a securities-fraud prosecution 'have so run amok that they are patently absurd on their face,' due to the 'kind of 'piling on' of points for which the guidelines have frequently been criticized.' "  *Id.* at 745 (quoting *Adelson*, 441 F. Supp. 2d at 515, 510).  In *United States v. Balboa*, Judge Crotty imposed a sentence of 48 months rather than the Guidelines term of life or the PSR's recommended 144 months, finding that the Guidelines overstated the offense to such an extent that the advisory sentence was "not serious" and could not be considered.  No. 12-cr.-00196, Sent. Tr. at 79-80, Dkt. No. 165 (June 23, 2014).  The court found the loss amount to be $390 million, which was the amount Balboa's hedge fund received from investors on fraudulent promises, resulting in a 28-point loss enhancement.  Tr. at 78-79.  In concluding that the offense level of 49 vastly overstated the crime, the court stated that the case showed the problems with "making a number a dominant factor and saying it excludes all the other factors—two offense level, three offense level, and all of a sudden 28."  Tr. at 68.

## VII.   CONSIDERATION OF THE SECTION 3553(a) FACTORS WARRANTS A SENTENCE FAR BELOW THE GUIDELINES SENTENCE.

We respectfully submit that both the 85-year advisory guideline sentence and the 30-year sentence recommended by Probation are draconian sentences that would be unjust in view of the facts of this case.  We further submit that a sentence anywhere near these sentences would be far greater than necessary to accomplish the goals of punishment.  We urge the Court to determine Mr. Greenwood's sentence based on the individualized facts of this case, taking into consideration all of the section 3553(a) factors.

Section 3553(a) provides that any sentence imposed must be "sufficient, but not greater than necessary" to accomplish the goals of sentencing.  18 U.S.C. § 3553(a).  To determine such a sentence, a court must give thorough consideration to each of the 3553(a) factors.  While the

Guidelines remain the "starting point and the initial benchmark," courts "may not presume that the Guideline range is reasonable" and must make an "individualized assessment" of the sentence warranted "based on the facts presented." *Gall v. United States*, 128 S. Ct. 586, 596-97 (2007). The Supreme Court has reiterated the fundamental principle that courts may consider "the widest possible breadth of information about a defendant" to ensure that the sentence will "suit not merely the offense but the individual defendant." *Pepper v. United States*, 131 S. Ct. 1229, 1240 (2011) (internal quotation marks omitted).

Among the factors that must be considered when determining an appropriate sentence are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant"; (4) the advisory Guidelines range; (5) any pertinent policy statement issued by the Sentencing Commission; and (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a).

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

We respectfully urge the Court to impose a sentence far below both the guideline sentence and Probation's recommended sentence—one that takes into account all of the section 3553(a) factors, including ████████████████████████████████

████████, the nature and circumstances of the crime, and Mr. Greenwood's history and characteristics.

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████

██████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████

**B.** **Mr. Greenwood's Cooperation with the Receiver to Maximize Victims' Recovery Is Grounds for a Substantially Below-Guidelines Sentence.**

Mr. Greenwood's efforts to help the Receiver maximize recovery for investors have been

substantial and weigh in favor of a sentence substantially below the Guidelines.  In cases where

the defendant's efforts in assisting with restitution are extraordinary, courts have found that a

downward variance may be warranted.  *See, e.g.*, *United States v. Suarez-Reyes*, No. 12 CR

0067, 2012 WL 6597814, at *7 (D. Neb. Dec. 18, 2012) (not reported) (imposing a below-

Guidelines sentence where the defendant "made extraordinary efforts in restitution . . . that can

be considered above and beyond the typical restitution that occurs in a criminal case.  He reached

a settlement agreement with the bank to pay back the money that was lost before he was

criminally charged and has been making restitution payments while on pretrial release.").  Even

pre-*Booker*, a number of courts found that a downward departure may be warranted where the

payment of restitution is extraordinary and where the defendant makes unusual efforts to assist

restitution.  For example, in *United States v. Roen*, 279 F. Supp. 2d 986, 990–91 (E.D. Wis.

2003), the court noted that a departure may be appropriate where "the defendant's effort to

remedy the wrong merits consideration, as, for example, where he makes extraordinary

restitution[.]"  In another pre-*Booker* case, the Eighth Circuit upheld a downward departure

under section 5K2.0 on the basis that the defendant made serious efforts at restitution and the

loss amount was largely returned after the fraud's discovery.  *United States v. Oligmueller*, 198

F.3d 669, 671-72 (8th Cir. 1999).  In *Oligmueller*, the defendant began making restitution one

year before the indictment, worked sixteen hours per day to maintain the value of assets,

relinquished his life insurance policy and his wife's certificate of deposit, gave up his home, and

paid nearly 94% of the amount owed to the victim before sentencing.  *Id.*; *see also United States

v. Kim*, 364 F.3d 1235, 1245 (11th Cir. 2004) (holding that restitution was extraordinary where

defendants used life savings and undertook significant debt to return what they took plus

interest).

    Here, Mr. Greenwood made extraordinary efforts to assist the Receiver, motivated by his

genuine remorse and desire to pay back investors as much as possible.  On an ongoing basis over

the last five years, he made himself available to assist the Receiver with the liquidation and

maintenance of assets, both business and personal.  As described earlier in this memorandum,

Mr. Greenwood turned over all of his personal assets to the Receiver beginning in March 2009,

inviting the Receiver to take everything to which investors had a claim.  Mr. Greenwood

understood that he had done wrong and wished to help the Receiver recover all assets wrongfully

acquired by Mr. Greenwood.

Moreover, Mr. Greenwood proactively worked with the Receiver to locate all assets—

both business and personal—and to maximize recovery from their liquidation.  Most importantly,

in early 2009, Mr. Greenwood provided the Receiver advice regarding how to maximize the

return from approximately $7-8 billion of positions in WGTC's portfolio.  Mr. Greenwood spent

hours discussing liquidation strategies with the Receiver and, along with others, strongly advised

that the portfolio should be liquidated as a basket.  The Receiver followed this advice and

recovered $811.9 million from the liquidation by May 2009.  *See* Receiver's First Report, at 4.

With respect to personal assets, Mr. Greenwood spent more than 100 hours making calls

and writing letters to allow the Receiver access to personal accounts and to promote and find

good buyers for the sale of personal assets.  In addition, from early 2009 to the present day, Mr.

Greenwood has assisted the Receiver's Controller with winding up the business of WGTC and

WGTI and maintaining the value of the properties that Mr. Greenwood surrendered in early

2009.  Finally, as described earlier, Mr. Greenwood provided valuable assistance to the Receiver

in its preparation of its initial plan for distribution of funds to investors.

Mr. Greenwood's extraordinary assistance, provided in the interest of helping victims

recover their money, attests to his genuine acceptance of responsibility.  His assistance helped

the Receiver obtain victim recovery of approximately 99% of their original investment—an

unusually high rate of recovery.  We submit that Mr. Greenwood's extraordinary efforts to assist the Receiver and facilitate restitution are grounds for leniency and a sentence far below the Guidelines.

### C.  Mr. Greenwood's Role in the Offense.

At the sentencing hearing held on October 29, 2014, Mr. Walsh's attorney argued that Agent Barnacle's testimony at the *Monsanto* Hearing showed that Mr. Walsh had a minimal role in the fraud compared to Mr. Greenwood.  We respectfully submit that Mr. Greenwood should not be sentenced as if he were more culpable than Mr. Walsh, because the evidence simply does not establish that Mr. Greenwood was more culpable.  We discuss these facts not to mitigate Mr. Greenwood's culpability but rather to respond to assertions made by Mr. Walsh to the Court in connection with his sentencing.

Specifically, Mr. Walsh stated that (a) the promissory notes "were submitted at the urging of Mr. Walsh's co-defendant," (b) Walsh operated in a different state than Mr. Greenwood, (c) Walsh had "no role in masterminding the fraud," and (d) Walsh "did not make presentations to the investors," had "no role in managing the books and records," and "didn't prepare statements."  Walsh Sentencing Tr. at 5, 7.

In fact, Agent Barnacle's testimony at the *Monsanto* hearing does not state that Mr. Walsh was less involved in designing the fraud or less culpable than Mr. Greenwood.  To the contrary, Agent Barnacle's testimony highlighted Mr. Walsh's central role, together with Mr. Greenwood, in making misrepresentations to investors, manipulating reported returns, signing promissory notes, and making unauthorized investments with investor money.  Indeed, Agent Barnacle's testimony showed that Mr. Walsh was completely knowledgeable about the misrepresentations that were being made to investors, at all times during the relevant period.  Mr.

Walsh also was directly involved in identifying and executing unauthorized investments with investor money, often bringing investment ideas to Mr. Greenwood and convincing him to agree to them.  In sum, the evidence presented at the *Monsanto* hearing clearly showed that Mr. Walsh and Mr. Greenwood were equally knowledgeable about the fraud they committed together.

**D.   The Nature and Circumstances of this Offense Distinguish this Case from Others with Similar Offense Levels and Warrant a Sentence Far Below the Guidelines Sentence.**

The fraud committed in this case is serious and deserving of punishment.  At the same time, in important ways, it is unlike many other fraud cases with similar offense levels.  We discuss these differences here not to minimize Mr. Greenwood's conduct or culpability, but rather to better define the nature of his crimes.

1.   The Guideline Loss Amount Greatly Overstates the Victims' Actual Loss.

The $958.8 million guideline loss amount—representing the principal invested with WG entities but not returned before discovery of the fraud—is the driving factor behind Mr. Greenwood's guideline sentence.  Without it, Mr. Greenwood's guideline range would be 12-18 months.  Yet this loss amount vastly overstates the amount of principal that investors actually lost: when the fraud was discovered, a great majority of the victims' principal remained invested in WGTC's hedged portfolio in index arbitrage.  Further, as a result of the Receiver's ongoing efforts, the victims are expected to recover approximately 99% of their principal.  While these facts do not reduce the loss amount for Guidelines purposes, we respectfully urge the Court to consider the unusual nature of the loss amount and the post-indictment recovery when considering the nature and seriousness of the crime pursuant to section 3553(a).

In this case, the victims have recovered approximately $855 million of their $958.8 million of principal, or about 89.1% of their original investment, as a result of the Receiver's

work and Mr. Greenwood's assistance.  *See* Order Granting Receiver's Request for Ext. of Time

Re: Third Distribution, No. 09-cv-1750, Dkt. No. 761.  An approved third distribution of $50

million will increase the recovery to $905 million, for a recovery rate of 94.3%.  *See id.*; Order

Granting Receiver's Mot. for Order Approving Third Distribution, No. 09-cv-1750, Dkt. No. 698

(11/19/2013).  Based on the Receiver's fund balance as of October 27, 2014, we anticipate that

the victims will recover approximately 99% of their principal after final distribution of funds to

investors and settlement of non-investor claims.  *See* Order Granting Receiver's Request, No. 09-

cv-1750, Dkt. No. 761.

As a result, the victims' lost principal will total close to $9 million—a large loss amount,

but nothing near $958.8 million.  This unusually high rate of recovery demonstrates that the

money lost in this fraud, by and large, was not the investors' principal but the investors'

promised and expected interest and returns.

Even more important than post-Indictment recovery is the nature of the $958.8 million

guideline loss amount.  When the fraud was discovered, the great majority of the $958.8 million

principal remained invested in WGTC's portfolio, consistent with the index arbitrage strategy

that was disclosed to investors.  Approximately $812 million was recovered by the Receiver

between March and May 2009 from the liquidation of this portfolio.  Ultimately, more than $830

million has been recovered from the liquidation of the accounts and assets of WGTC, WGTI, and

related entities—without counting the defendants' personal assets.  *See* Decl. of Brick Kane in

Supp. Motion to Approve Tenth Joint App. of the Receiver for Allowance of Comp., Ex. A, No.

09-cv-1750, Dkt. No. 737 (July 23, 2014), at p. 1 (reporting accounting for the period 2/25/09 to

12/31/13).[6]  This means that the vast majority of the victims' principal—the amount that the guideline loss number is intended to measure—was not lost but remained invested in WGTC.

    2.  <u>This Case Is Unlike a Typical Ponzi Scheme.</u>

We respectfully urge the Court to consider the fact that the fraudulent scheme in this case—unlike many investment frauds with high loss figures—did not begin as a fraud.  Mr. Greenwood and Mr. Walsh began their business in the early 1990s as a legitimate one implementing disclosed investment strategies that worked.  Throughout the 13-year period in which they committed fraud, they consistently invested a substantial percentage of investors' money in real, low-risk investments, using the advertised index arbitrage strategy.  As a result, when their fraud was discovered, WGTC's portfolio was such that the Receiver was able to recover more than 84% of investors' principal from the portfolio's liquidation between March and May 2009.  These facts do not excuse Mr. Greenwood's conduct.  But they distinguish this case from investment frauds that begin with the intention of stealing and involve little to no real investment activity.

These facts also distinguish this case from a typical Ponzi scheme case—like Charles Ponzi himself, or Madoff—in which the scheme is inherently fraudulent from the start and involves little to no investment activity at all.  *See, e.g.*, *Cunningham v. Brown*, 265 U.S. 1, 7 (1924) (describing the original Ponzi scheme); *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 110 n.15 (Bankr. S.D.N.Y. 2011) (noting that a Ponzi scheme is "by definition, at all times

---

[6] We estimate the $830 million figure by taking the total of "Cash & Positions Liquidation" and subtracting from that total the recovery from (a) Grand Central M&T Bank Balance, (b) Fund A and Fund R, and (c) Sam Group LLC.  *See* Decl. of Brick Kane in Supp. Motion to Approve Tenth Joint App. of the Receiver for Allowance of Comp., Ex. A, No. 09-cv-1750, Dkt. No. 737 (July 23, 2014), at p. 1.

insolvent"); *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006) ("[A] Ponzi scheme . . . is, as a matter of law, insolvent from its inception.").

For these reasons, while in no way denying Mr. Greenwood's significant fraudulent conduct, it is important to note that the type of fraud in this case is materially different from one that begins as a fraud, one in which there is no real investment activity, or one in which the investors' money is misappropriated the moment it reaches the defendant. We respectfully urge the Court to impose a sentence that reflects this distinction. *See United States v. Ovid*, No. 09-cr-216, 2010 WL 3940724, at *3 (E.D.N.Y. Oct. 1, 2010) (Gleeson, J.) (imposing a below-guideline sentence in part because the defendant's hedge fund "was not . . . started as a fraud"); *United States v. Hampton*, No. 13-cr-0301, 2013 WL 5366378, at *6 (S.D.N.Y. Sept. 25, 2013) (Sweet, J.) (imposing a below-guideline sentence and finding important the defendant's "motivation for conducting the offense (to recover losses suffered by the Fund)" in addition to his immediate cooperation and showing of remorse, among other factors).

Finally, this case is unlike many fraud cases with similar offense levels because the victims in this case have not suffered the devastating loss to personal savings that is characteristic of the worst investment frauds or the wide-scale shareholder loss or job loss that is characteristic of massive fraud in public companies. As noted in *Corsey*, not all loss should be treated the same for sentencing purposes:

> A fraud that results in the loss of even a few thousand dollars by an elderly or sick person who, as a result of the loss, becomes unable to afford the necessities of life or medical care is much more serious than a fraud that results in ten or a hundred times that loss by a large corporation able to absorb the financial consequences without a need to close plants, fire employees, or even declare the loss as material in public financial reports. Simply put, contrary to the assumption underlying the loss guideline, not all dollars of loss are fungible.

*Corsey*, 723 F.3d at 381.  While the loss in this case is serious and deserves punishment, it should not be treated the same as the devastating loss in the worst investment frauds.  *See, e.g.*, *United States v. Rigas*, 583 F.3d 108, 111 (2d Cir. 2009) (affirming sentences of defendants guilty of "massive corporate fraud" that wiped out all shareholder value).

**E.   Mr. Greenwood's History and Characteristics Warrant a Substantially Below-Guidelines Sentence.**

As the Supreme Court has emphasized, " '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.' "  *Pepper*, 131 S. Ct. at 1240.  We submit that Mr. Greenwood's personal history and characteristics warrant a substantially below-Guidelines sentence.  Mr. Greenwood's life-long history of selflessly helping others in times of need and serving his community is truly exceptional: time and time again, often unsolicited, he has acted to help individuals manage emotional and financial crises, overcome obstacles in their disadvantaged lives, and dedicate himself to the well-being of the community.

Mr. Greenwood also is a deeply devoted father who is badly needed by his daughters,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  Careful consideration of these aspects of Mr. Greenwood's life and character is essential to crafting a "punishment [that] will suit not merely the offense but the individual defendant."  *Id.* (internal quotation marks omitted).  We respectfully submit that consideration of these facts weighs strongly in favor of leniency.

1. <u>Mr. Greenwood's Crucial Role as Caretaker for His Daughters Warrants a Below-Guidelines Sentence.</u>



### 2. Mr. Greenwood's Extraordinary Good Works and Public Service

The nature and extent of Mr. Greenwood's good works, kindness, and service to others—beginning long before the fraud and continuing to the present day—is a hallmark of his life. Mr. Greenwood's good works are defined by the extraordinary and unusual acts he has taken, over and over again throughout his life, to help individuals in times of need—in both extraordinary and mundane ways, and to friends and virtual strangers alike. Most of these acts were taken in private and did not earn him any public recognition. Mr. Greenwood helped simply because he cared, and because kindness and compassion are inherent to his character. Mr. Greenwood is someone who is selflessly concerned with the well-being and success of others. Beyond this, he has contributed significant time and money to charitable, religious, and public service organizations, as described in section IV.C above.

The heartfelt stories described in the many letters to the Court speak for themselves. Time after time, Mr. Greenwood invested time and money to improve the lives of others—to fund desperately needed medical care, to sponsor college educations thought to be unattainable, to enable young people to pursue their professional dreams, to offer a stranger a pathway to a stable job, to help a struggling employee achieve citizenship, and to counsel friends on a range of personal, financial, and professional matters. As the letters detail, Mr. Greenwood has impacted

so many lives in meaningful and, at times, life-changing ways.  Importantly, Mr. Greenwood's acts of generosity and kindness began long before the fraud.  Many of the individuals he assisted, some almost 30 years ago, have written to the Court to express just how much Mr. Greenwood's help transformed their lives.

We respectfully submit that Mr. Greenwood's history of extraordinary acts to help others is far beyond the norm and provides a strong basis for a substantially below-Guidelines sentence. *See United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005).

We submit that Mr. Greenwood's good works are exceptional.  As stated in *Adelson*,

[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance. This elementary principle of weighing the good with the bad . . . was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*Adelson*, 441 F. Supp. 2d at 513-14.

## F.  Other Sentencing Factors

Mr. Greenwood is 67 years old and has been barred from working in the finance industry. As a result, there is no risk of recidivism.  Moreover, Mr. Greenwood has no desire to return to finance.  If he is given the opportunity to do so, either in prison or after completing his prison term, Mr. Greenwood intends to continue his service as a volunteer tutor to adults with learning and other disabilities.

## CONCLUSION

Mr. Greenwood, as made clear in this memorandum, fully recognizes the severity of his fraudulent conduct. ████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████ we
respectfully request a prison sentence of no more than five years for Mr. Greenwood.

Dated:     New York, New York
           November 19, 2014

                                              Respectfully submitted,


                                               s/ Frederick P. Hafetz
                                              Frederick P. Hafetz
                                              Nabilah T. Siddiquee
                                              HAFETZ & NECHELES, LLP
                                              One Grand Central Place
                                              60 East 42nd Street
                                              36th Floor
                                              New York, NY 10165
                                              Telephone: 212 997 7400
                                              Facsimile: 212 997 7646
                                              E-mail: fhafetz@hafetznecheles.com


                                              *Attorneys for Defendant Paul Greenwood*